**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**William C. PAGE, Defendant-Appellant.**

**Nos. 83–2257, 84–1628.**

United States Court of Appeals,
Tenth Circuit.

Jan. 2, 1987.
Rehearing Denied Feb. 4, 1987.

must be accepted as true.

Carl Hughes (Michael Gassaway, also of Hughes, Nelson & Gassaway, Oklahoma City, Okl., and Warren Gotcher, McAlester, Oklahoma, with him on the brief), for defendant-appellant.

Wesley C. Fredenburg, Asst. U.S. Atty., Oklahoma City, Okl., for plaintiff-appellee.

Before BARRETT, LOGAN, and BALDOCK, Circuit Judges.

LOGAN, Circuit Judge.

Defendant, William C. Page, was convicted by a jury of engaging in racketeering activities affecting interstate commerce, in violation of 18 U.S.C. § 1962(c), and of obstructing, delaying, and affecting interstate commerce by means of extortion under color of official right as an assistant district attorney and as a special district judge, in violation of 18 U.S.C. § 1951.

In this appeal defendant raises the following claims of pretrial error: (1) the government failed to correct misstatements to the grand jury and to present exculpatory evidence to the grand jury; (2) the government's affidavit in support of a wiretap authorization contained misrepresentations warranting suppression of incriminating tapes; (3) the government withheld *Brady*[1] and Jencks Act[2] material; and (4) the court erred in not conducting an *in camera* inspection of alleged Jencks Act material. Defendant also argues that the government's use of hypothetical questions assuming his guilt during cross-examination of his character witnesses is reversible error, and that, in any event, the trial court should have granted him a new trial based on newly discovered evidence. We reject all of these arguments.

Richard Riley was a client of defendant Page before defendant became an assistant district attorney. During an investigation by the Oklahoma Bureau of Narcotics (OBN), Riley sold methamphetamine to two OBN undercover agents and boasted to them that he could get cases "fixed" through then Assistant District Attorney Page. In an attempt to discover if Riley's claim was true, one of the agents asked Riley if defendant could get narcotics charges against his girlfriend, Marilyn Nicolai, dismissed. This was a fictitious charge, and "Nicolai" actually was an OBN undercover agent. Riley stated that he could fix the case for $500.

Riley called defendant to discuss the Nicolai charge on several occasions. Unbeknownst to defendant, the FBI recorded one of those conversations, in which defendant appears to have agreed to fix the case in exchange for a "car payment." "Car payment" appeared to be a code that Riley and defendant used to refer to bribes. Throughout the trial, defendant claimed that Riley had agreed to make car pay-

ments for defendant to pay past attorney fees that he owed.

At trial Riley was the government's principal witness. He testified to several instances in which he claimed he had paid defendant to intervene in pending criminal matters. These incidents allegedly occurred while defendant was an assistant district attorney and a special district judge. Evidence also suggested that defendant was aware that Riley was selling illegal drugs and that he provided Riley with information about investigations of Riley to protect him. Finally, there was evidence that defendant accepted payments from people other than Riley in exchange for fixing cases.

I

A

Defendant claims that his indictment should be dismissed because of the prosecutor's misconduct before the grand jury, specifically because the prosecutor allowed the grand jury to consider false testimony. This allegation arises from Riley's request that defendant provide him with photographs of undercover agents who Riley feared were investigating him. Defendant provided Riley with photographs, but these were not photographs of actual undercover agents. During the grand jury proceedings, however, FBI agent West testified that defendant had in fact given Riley photographs of undercover agents. Although the prosecutor knew this testimony was inaccurate, he said nothing to the grand jury.[3]

We may dismiss an indictment only if the prosecutorial misconduct is so flagrant that there was "some significant infringement on the grand jury's ability to exercise independent judgment." *United States v. Pino*, 708 F.2d 523, 530 (10th Cir.1983). Dismissal of an indictment after

---

1. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

2. 18 U.S.C. § 3500.

3. Defendant also asserts that the prosecution erroneously stated that defendant signed the dismissal of charges against Michael Sullivan. Yet defendant admitted at trial that he signed the dismissal.

a conviction is essentially a prophylactic measure, designed more to deter prosecutorial misconduct before the grand jury than to protect a particular defendant's rights. *United States v. Thibadeau*, 671 F.2d 75, 77–78 (2d Cir.1982). We will dismiss an indictment despite a subsequent conviction only in rare instances. If a petit jury has knowledge of the same misstatement made to the grand jury and nonetheless finds a defendant guilty beyond a reasonable doubt, it is unlikely that the error before the grand jury, which must find only probable cause, was prejudicial. *See Talamante v. Romero*, 620 F.2d 784, 791 (10th Cir.), *cert. denied*, 449 U.S. 877, 101 S.Ct. 223, 66 L.Ed.2d 99 (1980); *see also United States v. Mechanik*, ── U.S. ──, 106 S.Ct. 938, 942, 89 L.Ed.2d 50 (1986).

■ In *Talamante v. Romero*, 620 F.2d 784 (10th Cir.), *cert. denied*, 449 U.S. 877, 101 S.Ct. 223, 66 L.Ed.2d 99 (1980), we refused to dismiss an indictment that was partially based on perjured testimony because (1) the misstatement was exposed at trial, (2) the defendant cross-examined the perjurer, and (3) the evidence did not clearly absolve the defendant. *Id.* at 790–91. In the instant case, defendant had the opportunity at trial to cross-examine Riley and he testified himself about the photographs. In addition Riley, who received the photographs from defendant, testified at trial that they were not authentic. Despite this unrefuted testimony concerning the photographs' lack of authenticity, the jury convicted defendant. We are convinced accordingly that this evidence would not have affected the grand jury's finding of probable cause. The record does suggest that defendant provided Riley with false photographs because he did not want to endanger the undercover agents, but this does not negate the substantial evidence that defendant was willing to fix cases in exchange for money.

This clearly is not a case involving abuse, bad faith, or vindictiveness. Instead the prosecutor's failure to correct Agent West's testimony was, at worst, an oversight. The extraordinary remedy of dismissal of the indictment is not called for here. *Cf. United States v. Hogan*, 712 F.2d 757, 761–62 (2d Cir.1983) (dismissing indictment when prosecutor characterized defendant as a "real hoodlum," repeatedly elicited false evidence, and speculated on defendant's connection with other crimes).

### B

Defendant also asserts that the prosecution failed to present exculpatory evidence to the grand jury. He argues that the prosecution should have presented his tax returns and cancelled checks, and the testimony of R.J. Melton to the grand jury. The government counters that a prosecutor has no duty to disclose exculpatory evidence.

There are two views concerning the duty of a prosecutor to present exculpatory evidence to a grand jury. Some courts have held that there is no such duty. *See, e.g., United States v. Adamo*, 742 F.2d 927, 937–38 (6th Cir.1984), *cert. denied*, 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed.2d 975 (1985); *United States v. Sears Roebuck & Co.*, 719 F.2d 1386, 1394 (9th Cir.1983), *cert. denied*, 465 U.S. 1079, 104 S.Ct. 1441, 79 L.Ed.2d 762 (1984); *see also United States v. Civella*, 666 F.2d 1122, 1127 (8th Cir.1981) (prosecutor need not disclose facts that constitute a defense). These courts have reasoned that, because a grand jury is asked to determine probable cause rather than guilt or innocence, exculpatory evidence need not be presented. *See Sears*, 719 F.2d at 1394.

■ Other courts have stressed the importance of the grand jury hearing all relevant information and therefore have imposed a duty on the prosecutor to present exculpatory evidence. The Second and Seventh Circuits have suggested that, although a prosecutor need not present all conceivably exculpatory evidence to the grand jury, it must present evidence that clearly negates guilt. *United States v. Flomenhoft*, 714 F.2d 708, 712 (7th Cir. 1983), *cert. denied*, 465 U.S. 1068, 104 S.Ct. 1420, 79 L.Ed.2d 745 (1984); *United States*

*v. Ciambrone,* 601 F.2d 616, 622–23 (2d Cir.1979). This is the better, and more balanced rule, which we adopt. Under this standard the prosecutor is not obliged to ferret out and present every bit of potentially exculpatory evidence. But when *substantial* exculpatory evidence is discovered in the course of an investigation, it must be revealed to the grand jury. This promotes judicial economy. If a fully informed grand jury cannot find probable cause to indict, there is little chance the prosecution could have proved guilt beyond a reasonable doubt to a fully informed petit jury.

■ Applying this standard to the instant case, we find no error because the evidence defendant claims should have been presented to the grand jury was not clearly exculpatory. Defendant complains primarily about the prosecution's failure to show the grand jury checks from Riley to defendant marked as "attorney fees," and tax returns reflecting those payments as income from attorney's fees. That the checks were labeled attorney's fees was consistent with the prosecution's theory of the case, that Riley was paying defendant to fix cases under the guise of paying attorney's fees incurred while defendant was in private practice. The jury evidently agreed. Because this evidence was not clearly exculpatory, we find the draconian remedy of dismissal of the indictment inappropriate here.[4]

## II

Defendant argues that the tape recordings of his telephone conversations must be suppressed because of a defect in the prosecution's affidavit in support of a wiretap authorization.

As part of its investigation of defendant, the Oklahoma County District Attorney concocted false criminal charges against a fictitious person, "Marilyn Nicolai." Two undercover agents asked Riley to offer defendant money to "fix" these charges

against Nicolai, who they claimed was a girlfriend of one of the agents. FBI Special Agent Errol Myers, in his affidavit for a wiretap authorization, did not state explicitly that these charges against Nicolai were fictitious. He did say that an undercover operation had been in progress and at times referred to Nicolai as the "alleged" girlfriend of one of the undercover agents. R. IV, Def. Ex. 11, at 18, 31. But it was unclear from the affidavit whether an individual named Nicolai existed and whether the charges against her were real.

Courts have traditionally held that "affidavits containing misrepresentations are invalid if the error (1) was committed with an intent to deceive the magistrate, whether or not the error is material to the showing of probable cause; *or* (2) made nonintentionally, but the erroneous statement is material to the establishment of probable cause for the search." *United States v. Thomas,* 489 F.2d 664, 669 (5th Cir.1973) (emphasis added), *cert. denied,* 423 U.S. 844, 96 S.Ct. 79, 46 L.Ed.2d 64 (1975); *compare United States v. Luna,* 525 F.2d 4, 8 (6th Cir.1975) (wiretap order invalid for either intentional misrepresentation or reckless misrepresentation of material fact), *cert. denied,* 424 U.S. 965, 96 S.Ct. 1459, 47 L.Ed.2d 732 (1976). In *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), however, the Supreme Court held that to require an evidentiary hearing to challenge the validity of a search warrant, "[t]here must be allegations of deliberate falsehood or of reckless disregard for the truth" *as well as* a showing that if the alleged falsity or reckless disregard is set to one side there is not enough left "to support a finding of probable cause." *Id.* at 171–72, 98 S.Ct. at 2684. *See United States v. Ippolito,* 774 F.2d 1482, 1484–85 (9th Cir.1985) (requiring intentional and material misrepresentation); *United States v. Young Buffalo,* 591 F.2d 506 (9th Cir.), *cert. denied,* 441 U.S. 950, 99

---

**4.** Defendant also alleges that the testimony of R.J. Melton should have been presented to the grand jury. Although this testimony might have cast some doubt on one of the incidents named

in the indictment, in view of the number of illegal acts presented to the grand jury, this single omission does not call for dismissal of the indictment.

S.Ct. 2178, 60 L.Ed.2d 1055 (1979). We need not decide in the present factual context whether *Franks* has altered the *Thomas* standard, as we find that Myers' misrepresentations were neither intentional nor material.

■ We agree with the district court's finding that the misstatement in the affidavit was unintentional. In paragraph 4E of the affidavit, Myers explicitly weighed the advantages and disadvantages of "pursuing an indictment and conviction with the basis being a false and fictitous arrest," R. IV, Def. Ex. 11, at 5, the precise method of investigation employed. Despite the misleading nature of this affidavit, we do not think it was intentionally misleading. Instead, it appears to have resulted from negligence. The discussion of the Nicolai charge was only one part of a long affidavit. Had Agent Myers intended to deceive the magistrate he probably would not have included paragraph 4E, nor referred to Nicolai as an "alleged" girlfriend in two places, raising the possibility that either she or the charges against her were invented.[5]

■ Moreover, the misrepresentation in the affidavit was not material to the establishment of probable cause. To determine this issue, we ask whether the warrant would have been issued if the judge had been given accurate information. *See United States v. Ippolito*, 774 F.2d 1482, 1485 (9th Cir.1985). The question of materiality is a mixed question of law and fact,

subject to de novo review. *Id.* at 1484. We conclude that probable cause to issue the warrant would have existed even if the judge knew that Nicolai was an undercover agent and that the charges against her were fictitious.[6]

■ The only grounds the district court would have had for refusing to issue the warrant would have been that other avenues of investigation were still open. *See* 18 U.S.C. § 2518(3)(c).[7] But a wiretap authorization can be issued even if every possible means of investigation has not been tried. *See United States v. Todisco*, 667 F.2d 255, 258–59 (2d Cir.1981) (affidavit sufficient that disclosed use of standard investigative techniques and paucity of evidence which had resulted or could be expected to result), *cert. denied*, 455 U.S. 906, 102 S.Ct. 1250, 71 L.Ed.2d 444 (1982); *United States v. Martin*, 599 F.2d 880, 886–87 (9th Cir.) ("An investigative agency is not required to exhaust all possible investigative techniques before resorting to a wiretap."), *cert. denied*, 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1067 (1979). The affidavit revealed that several investigatory methods had been tried, including visual surveillance of the parties and the use of undercover agents. And the affidavit indicated that it was particularly important defendant not discover he was being investigated. On this basis, we conclude that the warrant would have been issued even if the district judge had been informed of the

---

5. We note that three different district court judges found the misrepresentation in the affidavit unintentional. First, Judge Ralph Thompson in this case found that the misstatement was inadvertent. R. II, 241. Second, the tapes made during the Page investigation led to the indictment and trial of Oklahoma state senator Mike Combs. Two different district court judges reviewed the Myers affidavit and found no intentional deception. *See United States v. Combs*, No. CR–83–243–E (W.D.Okla. Dec. 8, 1983) (Eubanks, J., denying motion to suppress); *United States v. Combs*, No. 84–40011–01 (D.Kan. April 17, 1984) (Rogers, J., denying motion to suppress).

6. In the separate prosecution of Oklahoma state senator Mike Combs, which involved the same

warrant and affidavit as that challenged here, the issuing judge stated that "[t]he permit would have been granted even had this court been aware of the undercover application." *United States v. Combs*, No. CR–83–243–E (W.D. Okla. Dec. 8, 1983) (order denying motion to suppress). In so stating, he held in effect that the misrepresentation was not material to his decision to issue the warrant.

7. 18 U.S.C. § 2518(1)(c) requires: "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."

fictitious nature of Nicolai and the charges against her.

## III

■ Defendant also claims that the government violated its *Brady* obligations by failing to reveal that Riley had been arrested on October 16, 1982, for burglary and assault with a deadly weapon. He claims that this evidence could have been used to impeach Riley. We agree with the district court's finding that the government's omission did not justify a new trial because such evidence would have been ·cumulative. The district court noted defendant's proof that Riley had been convicted of seven felonies. We think it unlikely that evidence of an additional arrest would have swayed the jury. *See United States ex rel. Marzeno v. Gengler,* 574 F.2d 730, 737–38 (3d Cir.1978).

■ In addition, Fed.R.Evid. 608(b) permits use of prior bad acts, such as arrests without convictions, to impeach a witness only if "probative of truthfulness or untruthfulness." *See, e.g., United States v. Bentley,* 706 F.2d 1498, 1509–10 (8th Cir.) (barring impeachment based on prior drug indictment), *cert. denied,* 464 U.S. 830, 104 S.Ct. 107, 78 L.Ed.2d 110 (1983); 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 608[05], at 608–32 to –34 (1985 & Supp. 1985). Acts admissible under Rule 608(b) include "forgery, uttering forged instruments, bribery, suppression of evidence, false pretenses, cheating, [and] embezzlement,...." *Id.* at 608–33 (quoting Ladd, *Credibility Tests—Current Trends,* 89 U.Pa.L.Rev. 166, 180 (1940)). Here Riley was arrested for burglary and assault, based on a domestic dispute. Evidence of this dispute was not probative of his credibility. *See* Wigmore, *Evidence* § 982, at 550 (3d ed. 1940) (robbery and assault do not impugn witness' credibility). The government's failure to disclose it does not require a new trial.

## IV

Defendant's final claim of pretrial error is the district court's failure to require the government to submit documents for *in camera* inspection. Defendant contends that the court erroneously accepted the government's assertion that the challenged materials were not within the Jencks Act, 18 U.S.C. § 3500. The documents at issue are the books, records, and ledgers of the Mid-States Distributing Co., a company belonging to Richard Riley and marketing "turkey drugs," non-controlled substances that simulate the effects of controlled substances.

■ Certain materials, such as signed statements made to the police, are clearly discoverable under the Jencks Act. 18 U.S.C. § 3500(e)(1). But other materials, such as tax returns, are clearly not statements discoverable under the Jencks Act. *See United States v. Carrillo,* 561 F.2d 1125, 1128 (5th Cir.1977). Finally, there are materials about which there exists substantial doubt as to whether they are "statements" under the Jencks Act. Only with respect to this last category of documents is the court obligated to conduct an *in camera* review to determine if the defendant is entitled to discover them. *See Palermo v. United States,* 360 U.S. 343, 354, 79 S.Ct. 1217, 1225, 3 L.Ed.2d 1287 (1959);[8] *United States v. Dark,* 597 F.2d 1097, 1099 (6th Cir.), *cert. denied,* 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 183 (1979).

■ We conclude that no *in camera* inspection of the Mid-States Distributing Co. records was necessary because these records fall within the second category,

---

8. In *Palermo* the Court stated:
"The statute itself provides no procedure for making a determination whether a particular statement comes within the [Jencks Act]. and thus may be produced if related to the subject matter of the witness' testimony.... [W]hen it is doubtful whether the production of a particular statement is compelled by the statute, we approve the practice of having the Government submit the statement to the trial judge for an *in camera* determination. Indeed, any other procedure would be destructive of the statutory purpose."
*Palermo v. United States,* 360 U.S. 343, 354, 79 S.Ct. 1217, 1225, 3 L.Ed.2d 1287 (1958).

materials that are clearly not discoverable "statements" under the Jencks Act. Section 3500(e) states:

"(e) The term 'statement', as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury."

18 U.S.C. § 3500(e). In *Ayash v. United States*, 352 F.2d 1009 (10th Cir.1965), we defined a Jencks Act statement as a "substantial verbatim recital of the witness's own words." *Id.* at 1012. Corporate records and accounts do not fit this description; they are more like the tax returns recognized by the court in *Carillo* as not discoverable under the Jencks Act. *Carillo*, 561 F.2d at 1128. Defendant has not pointed to any court that has found such material within the Act, and our research has revealed no such decisions.

Defendant relies primarily on our decision in *United States v. Peters*, 625 F.2d 366 (10th Cir.1980), for his contention that the trial court erroneously accepted the government's assertion that the documents were not within the Jencks Act. In *Peters* we found that it was error for the trial court to accept the United States attorney's representation that, although statements within the Jencks Act were in his possession, he did not have to disclose them to the defense because they were unrelated to the testimony at trial. *Id.* at 370. In the instant case, however, the Jencks Act request was facially invalid.

Accordingly, we find no error in the district court's decision.

## V

Defendant claims that allowing the prosecutor to use hypothetical questions assuming his guilt is reversible error. In seven instances the prosecutor asked a character witness, who previously had testified to defendant's good reputation for truth and veracity, if the witness' opinion would be different if he or she learned that defendant had accepted bribes. Each witness predictably responded that the opinion would change.

The prosecution admits, as it must, that these questions were improper. *See United States v. Polsinelli*, 649 F.2d 793, 797 (10th Cir.1981). But it contends that use of these questions was harmless beyond a reasonable doubt. We agree.[9]

■ The use of such hypothetical questions has resulted in reversal when the case was essentially a one-on-one swearing contest. *See Polsinelli*, 649 F.2d at 798; *United States v. Candelaria-Gonzalez*, 547 F.2d 291, 293 (5th Cir.1977). Character evidence assumes greater importance in those situations. *See Polsinelli*, 649 F.2d at 798. But defendant's case was not solely a contest of credibility between defendant and Riley. Instead defendant was convicted primarily out of his own mouth; the most damaging evidence at trial came from his recorded conversations with Riley. *See United States v. James*, 728 F.2d 465, 467–68 (10th Cir.), *cert. denied*, 469 U.S. 826, 105 S.Ct. 106, 83 L.Ed.2d 50 (1984); *United States v. Primrose*, 718 F.2d 1484, 1493 (10th Cir.1983), *cert. denied*, 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984). Finally, the district court twice instructed the jury that these questions were improper. In view of the overwhelming evidence against defendant and the district court's

9. We note that defendant's attorney objected only the first two times the questions were asked. He claims that the district judge expressed "displeasure" at his second objection and thus he decided to remain silent the next five times. The record does not support the contention about the judge's expression of displeasure.

instructions to the jury, we find the error harmless.

## VI

Finally, defendant contends that he should be granted a new trial because, after trial, he learned of new exculpatory evidence withheld by the government in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, defendant alleges that Ken Nelson, Riley's business partner, had told FBI agents on two occasions, and an Assistant United States Attorney on another occasion, that he knew that Riley was making payments to defendant for past attorney fees. The FBI "302 reports" submitted to defendant stated only that Nelson "assumed" the payments were for attorney fees. Defendant also asserts that Riley had told the FBI that these amounts were car payments. Unlike Nelson's statements concerning attorney fees, the FBI did not include in their reports any reference to Nelson's comments about car payments.

On April 17 and 18, 1984, the district court held an evidentiary hearing to determine whether the government had withheld evidence wrongfully. At this hearing, Nelson testified that he had told the FBI agents that he *knew* Riley was paying defendant for "previous attorney fees." Further, Nelson asserted that he had been present at a meeting between Riley and defendant at which these past "attorney fees" were discussed. The agents denied that Nelson had told them that he had personal knowledge and knew the purpose of these payments.

Further, Nelson testified that before defendant's trial he had conveyed this information to Wesley Fredenburg, the Assistant U.S. Attorney prosecuting this case. Fredenburg denied that he had discussed these matters with Nelson before defendant's trial and no report of this meeting was submitted to the defense.

The district court denied the motion for a new trial. First, it noted the outright contradiction between the testimony of Nelson and the FBI agents with respect to whether Nelson told the agents that he knew rather than assumed that the payments were for past attorney fees. The court also noted that there was a direct conflict between the testimony of Nelson and Fredenburg concerning their pretrial meeting. In both instances, basing its decision largely on Nelson's lack of credibility, the court found that defendant had failed to establish that the government had withheld exculpatory evidence. With respect to the evidence concerning car payments, the court found that even if this evidence was exculpatory, it would have been cumulative and would not have affected the outcome of the trial. We agree.

In *United States v. Sutton,* 767 F.2d 726 (10th Cir.1985), we set out the requirements for granting a new trial on the basis of newly discovered evidence:

"The alleged newly discovered evidence must be more than impeaching or cumulative; it must be material to the issues involved; it must be such that it would probably produce an acquittal; and a new trial is not warranted if the new evidence is such that, with reasonable diligence, it could have been discovered and produced at the original trial. The motion is not regarded with favor and should be granted only with great caution, being addressed to the sound discretion of the trial court."

*Id.* at 728 (citation omitted); *see also United States v. Ramsey,* 726 F.2d 601, 604 (10th Cir.1984). Even if this evidence was in the possession of the prosecution, we reverse only if the omitted evidence is material in the sense that its suppression undermines confidence in the outcome of the trial. *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). We note, as a threshold matter, that the district court found that Nelson's testimony concerning attorney fees was not newly discovered evidence. This determination was based on Nelson's lack of credibility, and is thus particularly unsusceptible to review. *Cf. Miller v. Fenton,* 474

U.S. 104, 106 S.Ct. 445, 451, 88 L.Ed.2d 405 (1985).

Nevertheless, even assuming that Nelson testified truthfully, we conclude that his testimony does not provide a basis for reversal. There is no indication that Nelson had any substantive basis for his assertion that Riley was paying defendant for past attorney fees. We cannot find that his bald assertion that Riley was paying defendant attorney fees would have affected the outcome of defendant's trial. In addition, checks with the notation "attorney's fee" on them were introduced and other witnesses testified that Riley was paying defendant past attorney fees. Nelson's testimony accordingly would have been cumulative. The trial court did not abuse its discretion in denying a new trial based on Nelson's testimony concerning attorney fees.

We also agree with the district court's decision not to grant a new trial based on Nelson's testimony that Riley was making car payments for defendant. Unlike Nelson's testimony concerning attorney fees, Nelson's statements concerning car payments were not in the FBI 302 reports submitted to defendant. FBI Agent West testified that Nelson did say that Riley was making car payments for defendant, but he did not include this in his report because he doubted Nelson's credibility. Defendant argues that relevant evidence must be turned over to the defense even if not believed by the prosecution. As a general matter, we agree. But we also appreciate that we are dealing with the realities of a complicated criminal investigation. We cannot require that an FBI agent in the course of an investigation record every statement a witness makes so that it can be considered by the defense. *Cf. United States v. Agurs*, 427 U.S. 97, 109, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976) ("If everything that might influence a jury must be disclosed, the only way a prosecutor could discharge his constitutional duty would be to allow complete discovery of his files as a matter of routine practice.").

Here there was no indication that Agent West acted in bad faith in failing to include Nelson's statement concerning car payments in his 302 report. Even if Nelson's statements should have been included in Agent West's 302 report, a new trial would not be warranted. The government admits, and the evidence indicates, that defendant used much of the money Riley paid to him for car payments. The government's theory was that Riley made these payments to defendant in return for fixing cases. How defendant then used the money is simply not exculpatory. We thus find that this evidence would not have affected the outcome of defendant's trial, and provides no basis for reversal.

The decision of the district court is AFFIRMED.[10]

---

**10.** We note that since this case was argued another motion for a new trial has been presented to the district court. We understand a new trial has been denied with respect to one issue raised in that motion, but that another issue and a motion for recusal are still pending. The delay in the disposition of this case has already been considerable. We have decided to issue the instant opinion, expressly stating that we have not considered any of the issues raised in the 1986 motion for new trial, and our decision is without prejudice to consideration of any such issues in a future appeal.